# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# Richmond Division

| | |
|---|---|
| PARIS LOVING-JOHNSON ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:20-cv-530 |
| ) | |
| KHAIRUL BASHAR ) | |
| MOHAMMAD EMRAN, M.D., ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT

Comes now the Plaintiff, Mr. Paris Loving-Johnson, by counsel, and hereby respectfully moves this Court for judgment against Defendant Doctor Khairul Bashar Mohammad Emran ("Dr. Emran"). In support of this request, Plaintiff states as follows:

## JURISDICTIONAL STATEMENT

1. This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3) over Plaintiff's 42 U.S.C. § 1983 claim asserted herein.

2. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

3. Assignment to the Richmond Division of the Eastern District of Virginia is proper pursuant to Eastern District of Virginia Local Rules 3(B)(4) and 3(C), because a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this division.

## SUMMARY OF THE CASE AND INTRODUCTION OF PARTIES

4. The allegations set forth in this Complaint arise out of injuries, suffering and anguish endured by Mr. Loving-Johnson while incarcerated at the Richmond City Justice Center

(the "RCJC") due to Dr. Khairul Bashar Mohammed Emran's deliberate indifference to his serious medical needs.

5. Mr. Loving-Johnson, was at all relevant times an inmate at the RCJC who had been previously diagnosed with Crohn's disease, an illness which causes him to experience a variety of unpleasant, frightening, and painful symptoms; as well as subjecting him to higher risk for other serious medical complications, to include gastrointestinal clotting and necrosis.

6. Due to Mr. Loving-Johnson's condition, he had previously been transported to the Medical College of Virginia ("MCV") for hospital treatment related to serious gastrointestinal clots. Between October 19, 2014, and November 15, 2014, Mr. Loving-Johnson was transported to MCV on at least three different occasions. After that, Mr. Loving-Johnson was transported to MCV one more time on January 7, 2015.

7. Following these visits, Mr. Loving-Johnson was under the care of Dr. Emran who, at that time, was the medical director and physician in charge of the medical department at the RCJC. Dr. Emran is sued in his individual capacity. A correctional medicine company called Naphcare employed Dr. Emran at all relevant times and was under contract to provide constitutionally adequate health care services at the Richmond City Justice Center

8. Subsequent to the January MCV visit, Mr. Loving-Johnson made similar, and increasingly urgent complaints about pain, rectal bleeding, and severe swelling. However, despite showing no improvement to his serious condition and repeated requests for hospital care, Mr. Loving-Johnson was denied access to necessary treatment and care at MCV. Upon information and belief, the decision to not send Mr. Loving-Johnson back to MCV after January 7, 2015, was not medically based, but was a punitive decision based on Dr. Emran's perception that Mr. Loving-Johnson was a difficult, uncooperative, and non-compliant patient.

9. After weeks of complaints and pain, as well as direct complaints to then Sheriff C.T. Woody regarding the inadequacy of Dr. Emran's treatment and Mr. Loving-Johnson's ongoing suffering, Mr. Loving-Johnson was transferred into the custody of the Virginia Department of Corrections ("VDOC").  Only two days after being transferred to VDOC, Mr. Loving-Johnson was emergently transported to a local hospital.  Providers at that facility determined that Mr. Loving-Johnson's condition was too serious to be treated there and had Mr. Loving-Johnson was transferred to MCV on June 5, 2015.  Upon his arrival, Mr. Loving-Johnson required immediate surgery and remained in the hospital for over a month.

10. Prior to his transfer into VDOC custody, Mr. Loving-Johnson exhibited pain and serious symptoms for months while being refused transfer to MCV for hospital treatment.  During this time, Dr. Emran allowed Mr. Loving-Johnson to needlessly suffer, denied him access to medical care, and permitted Mr. Loving-Johnson's condition to significantly worsen to the point that an emergency bowel resection was required to save his life.

## **FACTS**

11. At all times relevant to the allegations of this Complaint, Mr. Loving-Johnson was an inmate at the RCJC, apart from a short period following his transfer to the VDOC.  After the events detailed in this Complaint, he was transferred to the Powhatan Medical Unit, and then to Deep Meadow Correctional Center.

12. For the relevant timeframe, all medical services performed upon inmates housed in the RCJC were performed by employees of NaphCare, a private medical contractor.

13. Mr. Loving-Johnson suffers from Crohn's disease.  Before his transfer to MCV for emergency treatment on June 5, 2015, Dr. Emran aware of Mr. Loving-Johnson's condition.

14. Crohn's disease is an incurable inflammatory disease that causes patients, such as Mr. Loving-Johnson, to suffer from painful and often debilitating symptoms. Some of the effects of Crohn's disease, such as blood clots, can be life threatening. This was known to Dr. Emran prior to Mr. Loving-Johnson's June 2015 emergency surgery. Surgery is sometimes necessary for those who suffer from uncontrolled Crohn's disease.

15. On October 10, 2014, Mr. Loving-Johnson saw Dr. Emran for a medical exam. Dr. Emran noted that Mr. Loving-Johnson was suffering from rectal bleeding and abdominal pain. Dr. Emran was aware at the time of this exam that Mr. Loving-Johnson suffered from Crohn's disease, a serious medical condition which required proper treatment and monitoring.

16. On October 19, 2014, Mr. Loving-Johnson was taken to MCV for additional treatment. He was discharged and sent back to the RCJC.

17. During a follow-up examination on October 27, 2014, Dr. Emran noted that Mr. Loving-Johnson had a swollen left leg and was continuing to experience abdominal pain. Due to a "Crohn's disease fare [sic] up," Dr. Emran sent Mr. Loving-Johnson to MCV for hospitalization again.

18. Mr. Loving-Johnson remained in MCV for over a week. During this week, MCV treated Mr. Loving-Johnson for a host of medical issues, such as Crohn's, portal vein thrombosis, anemia, and pyoderma gangrenosum. Mr. Loving-Johnson also required a colon biopsy, treatment of ulcers, and heavy medication for both medical symptoms and extreme pain.

19. Upon his return to the RCJC, Mr. Loving-Johnson began experiencing extreme pain and rectal bleeding once again. On November 11, 2014, Mr. Loving-Johnson was transferred to MCV again, where he stayed for four days. During his hospital stay, the blood clot in his abdomen

was found to be worse. He was discharged from MCV and returned to the RCJC on November 15, 2014.

20. After Mr. Loving-Johnson's return from the MCV, he experienced a period of somewhat improved symptomology. He took various medications and frequently reported minor or no complaints during his visits with NaphCare staff. Mr. Loving-Johnson was taken to MCV one more time, on January 7, 2015, for a check-up. MCV noted cellulitis on his leg and recommended continuing prescriptions, but did not note anything else of interest.

21. At discharge from MCV, Mr. Loving-Johnson was placed on a Predisone taper by the physicians at MCV. Predisone is a temporary steroid treatment therapy commonly used to control Chron's flares. Predisone, however, has serious side effects in some patients, and is known to sometimes cause negative psychiatric symptoms. There are known, available alternatives to Predisone for patients who experience negative side effects.

22. Mr. Loving-Johnson repeatedly reported experiencing serious side effects to Naphcare employees as a result of his taking oral Prednisone. Specifically, Mr. Loving-Johnson claimed that Prednisone caused him to suffer from altered mental status or steroid-induced psychosis; Dr. Emran knew of these complaints, but made no attempt to investigate them. Nor did Dr. Emran send Mr. Loving-Johnson out for specialty care or consult with any specialists despite the known, complex nature of Mr. Loving-Johnson's medical condition.

23. Given the side effects that Prednisone had on Mr. Loving-Johnson, he chose not to take the medication rather than risk psychiatric decompensation in the correctional setting. Although Dr. Emran was aware that Mr. Loving-Johnson was not taking the medication prescribed for his Crohn's disease and that, without proper treatment, the condition could become severely

aggravated and even life-threatening, Dr. Emran did not and would not provide Mr. Loving-Johnson any alternate therapy for the management of Mr. Loving-Johnson's Crohn's disease.

24. Despite these issues, Mr. Loving-Johnson experienced multiple months of relatively controlled management of his Chron's symptoms. Nevertheless, Dr. Emran discontinued multiple medications for Mr. Loving-Johnson on April 2, 2015.

25. On April 14, 2015, less than two weeks after cancellation of his prescriptions, Mr. Loving-Johnson reported blood in his stool again.

26. On April 28, 2015, Mr. Loving-Johnson continued to report blood in his stool. Dr. Emran noted that Mr. Loving-Johnson was having a possible Crohn's flare up.

27. Inexplicably, although Mr. Loving-Johnson experienced symptoms as serious as or worse than he had previously experienced, he was not immediately transferred to MCV, nor was hospitalization apparently even considered. Dr. Emran knew that flaring irritable bowel syndrome, by itself, created a serious risk for developing clots. Dr. Emran was aware that this risk was even more pronounced in Mr. Loving-Johnson's case given Mr. Loving-Johnson had recently been hospitalized for severe gastrointestinal clotting. Yet, the only treatment Dr. Emran was willing to order for Mr. Loving-Johnson to ameliorate this risk of harm offer was Prednisone, a medication that he already believed Mr. Loving-Johnson would refuse to take. Despite available alternatives to Prednisone, Dr. Emran refused to consider other treatment options. The end result was Dr. Emran did not order any meaningful treatment for Mr. Loving-Johnson and knew that his flare up would be left completely unmanaged.

28. On May 5, 2015, Mr. Loving-Johnson saw nurse Cecilia Faison with a fever and reported body aches and pains as well as nausea and vomiting. He was referred to sick call and Dr. Emran became aware of these complaints on no later than May 6, 2015.

29. On May 6, 2015, Dr. Emran saw Mr. Loving-Johnson and was aware that Mr. Loving-Johnson had been suffering from rectal bleeding for 3-4 days as well as abdominal cramping. Dr. Emran drew the inference that Mr. Loving-Johnson's presentation was due to his Crohn's disease and documented that management of the Crohn's flares was "poor" and that his disease status had "worsened." However, Dr. Emran simply prescribed Prednisone in response to his awareness of these medical concerns despite knowing that Mr. Loving-Johnson would not take the medication.

30. On May 7, 2015, Mr. Loving Johnson complained to Nurse Beverly Daniels ("Nurse Daniels") that he felt he should not be taking some of the medicine he has been prescribed. Dr. Emran became aware of these complaints no later than May 12, 2015.

31. On May 9, 2015, Mr. Loving-Johnson reported to Nurse Phyleiscia Washington that he had observed more blood in his stool. In response, Nurse Washington advised to take his medication and to follow up with Dr. Emran on May 12, 2015. Dr. Emran became aware of these complaints and Nurse Washington's response no later than May 12, 2015.

32. On May 11, 2015, Mr. Loving-Johnson complained to Nurse Daniels of "constant" abdominal pain. As a result, he was moved into medical observation housing pending evaluation by Dr. Emran, due to being "ill."

33. On May 12, 2015, Mr. Loving-Johnson presented to Nurse Angela Patterson with complaints of "stomach pains." Dr. Emran became aware of these complaints on that same day and when he met with Mr. Loving-Johnson. Mr. Loving-Johnson requested that Dr. Emran send him to the hospital for evaluation and treatment of his rectal bleeding. Dr. Emran declined to order any diagnostic testing, did not perform any examination, did not send Mr. Loving-Johnson to the hospital, and did not call or consult with any other doctors. Instead, he "[a]dvised [the patient] to

let us know if he change [sic] his mind and wants to take all medicines." Despite knowing that Mr. Loving-Johnson would not take Prednisone due to his concerns regarding the side effects of the medication, Dr. Emran did not offer Mr. Loving-Johnson any alternate medications. Dr. Emran then "medically cleared" Mr. Loving-Johnson from medical observation to return to his regular housing assignment, despite having not even conducted a proper medical evaluation of Mr. Loving-Johnson's medical condition.

34. On May 16, 2015, Mr. Loving-Johnson reported to the medical office and complained to Nurse Tracy Johnson that he had been throwing up for 18 days. He presented a bag of "yellow-colored emesis" to substantiate these claims to the facility's health care staff. Medical staff called Dr. Emran that same day and advised him of Mr. Loving-Johnson's complaints. Despite knowing that Mr. Loving-Johnson's complaints were symptoms of a Crohn's flare up, Dr. Emran did not order any medical care that would actually treat the flare up. Rather, he only ordered care responsive to the immediate symptoms—i.e., ordering Mr. Johnson receive a clear liquid diet and entering a prescription for Phenergan and Meclizine.

35. On May 19, 2015, Mr. Loving-Johnson met with a psychiatrist and reported that he was recently on as course of steroid for his Crohn's disease and that his mood disorder gets worse when on the steroids (steroid psychosis). There is no documentation of any follow up regarding alternative steroid treatment pursuant to this report.

36. On May 23, 2015, Mr. Loving-Johnson's mother, Nicole Loving ("Ms. Loving"), sent a text message to Sheriff Woody's cell phone (which included a picture of Mr. Loving-Johnson's swollen leg) and informed Sheriff Woody that Mr. Loving-Johnson was not receiving proper medical care. Ms. Loving told Sheriff Woody that "he needs to be hospitalized." An hour later, Ms. Loving sent another text message to Sheriff Woody pleading with him to go see Mr.

Loving-Johnson himself so that he could observe Mr. Loving-Johnson's serious and unhealthy weight loss.

37. The same day, Mr. Loving-Johnson reported stomach and bilateral leg pain to medical staff at the RCJC.

38. The weight loss that Ms. Loving referred to was objectively apparent. Mr. Loving-Johnson had lost more than 15 pounds in three months.

39. Sheriff Woody replied to Ms. Loving's pleas by acknowledging that he was aware of Mr. Loving-Johnson's condition and that Mr. Loving-Johnson was hurting. Sheriff Woody stated, "We are trying very hard to get him to doc. He is in pain."

40. On May 24, 2015, Ms. Loving contacted Sheriff Woody again, stating that she expected Mr. Loving-Johnson to be hospitalized and again pleading that Sheriff Woody allow her son to be hospitalized. Ms. Loving even offered to pay the expenses of hospitalization, if necessary.

41. The next day, Sheriff Woody responded to Ms. Loving's further pleas for help by telling her that he does not make any medical decisions and that the responsibility of moving Mr. Loving-Johnson rested with the jail's contracted medical department.

42. When asked in deposition testimony if he reported these communications to medical personnel, Sheriff Woody stated "I'm sure I did… That would have been exactly what I would have did [sic], was normal procedure for me to go and notify medical immediately what the inmate said to me."

43. On May 26 and May 27 Ms. Loving contacted Sheriff Woody again by text message to request that he get in touch with her to help her get Mr. Loving-Johnson out of Sheriff Woody's custody and into a hospital. Sheriff Woody did not respond.

44. On May 27, 2015, Mr. Loving-Johnson saw Dr. Emran and complained of bleeding that had stopped 7 days ago, followed by nausea and cramping for 1 week and muscle pain. Dr. Emran did nothing to further evaluate these complaints of bleeding followed by cramping and nausea, despite the patient's documented history of life-threatening clotting. Instead, the only care Dr. Emran ordered concerning Mr. Loving-Johnon's symptoms was the continued availability of Predisone to Mr. Loving-Johnson, despite knowing that Mr. Loving-Johnson had not been taking the medication and would not do so.

45. Ms. Loving feared for Mr. Loving-Johnson's life and felt that her attempts to get Mr. Loving-Johnson proper medical treatment would not be addressed soon enough. Therefore, Ms. Loving, an employee of the Virginia Department of Corrections, took it upon herself to get Mr. Loving-Johnson transferred to a facility that would provide him with proper care. Using her contacts within the VDOC, Ms. Loving was able to successfully arrange a transfer for Mr. Loving-Johnson.

46. On June 1, 2015, Mr. Loving-Johnson was transferred to Nottoway Correctional Center, under the control of the VDOC.

47. On or about June 3, 2015, Mr. Loving-Johnson was transferred to a local hospital in or around Nottoway County, in order to properly address his increasingly serious medical conditions.

48. At the local hospital, medical staff determined that Mr. Loving-Johnson's condition was so serious that they lacked the equipment and/or medical expertise to properly treat him. The staff at the local hospital arranged for Mr. Loving-Johnson to be transferred to MCV, where Ms. Loving had requested Mr. Loving-Johnson be transferred to in the first-place weeks earlier.

49. On June 5, 2015, after nearly two months of medical complaints, which included consistent vomiting, rectal bleeding, and severe swelling, and 12 days after Ms. Loving personally contacted Sheriff Woody to request her son be hospitalized, Mr. Loving-Johnson was finally transferred to be hospitalized at MCV.

50. Upon Mr. Loving-Johnson's arrival at MCV, doctors realized that he had endured serious medical complications and he was immediately taken to surgery.

51. Specifically, Mr. Loving-Johnson was diagnosed with portal vein thrombosis (clot blockage to the portal vein), SMV thrombosis (clot blockage to the superior mesenteric vein) and mesenteric ischemia (restricted blood flow to the intestines).

52. All of the above listed conditions are life-threatening and required emergency intervention. As a result, Mr. Loving-Johnson required surgery to remove a significant portion of his small bowel.

53. After being hospitalized at MCV for over a month, Mr. Loving-Johnson was discharged on July 9, 2015. He was transferred to the Powhatan Medical Unit in Farmville, Virginia, a VDOC facility.

54. The long and unnecessary delay in getting Mr. Loving-Johnson to MCV caused him significant needless pain and suffering.

### Count I
### 42 U.S.C. § 1983 - DELIBERATE INDIFFERENCE
### (Dr. Emran)

55. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

56. At all times referenced herein, Dr. Emran was a person acting under color of state law by virtue of Naphcare's contract with RCJC and was required to provide Mr. Loving-Johnson

constitutionally adequate medical care for his objectively serious medical needs within the meaning of controlling decisional law.

57. Mr. Loving-Johnson, as a convicted inmate incarcerated at the RCJC, had a constitutional right to receive the medical care necessary to address his serious medical needs under the Eighth Amendment.

58. Mr. Loving-Johnson's medical condition was at all times objectively serious while he was under the care of Dr. Emran. In particular, following April 14, 2015, Mr. Loving-Johnson was a patient with a known history of Chron's disease with serious, potentially life-threatening complications, including severe abdominal clotting who was demonstrating symptoms of increasing severity that were consistent with symptoms that had required prior hospitalization while at the RCJC.

59. At all times on and after the 2014 hospitalization, Dr. Emran was subjectively aware that failure to treat Chron's symptoms of this severity caused Mr. Loving-Johnson agony and, left unchecked, dramatically increased his risk for serious injury.

60. Dr. Emran was subjectively aware that Mr. Loving-Johnson refused to take Prednisone and, at times, Coumadin, and that these refusals significantly increased the danger that Mr. Loving-Johnson would experience a serious medical emergency related to his untreated Chron's flares. Dr. Emran also knew that Mr. Loving-Johnson would experience increased pain and agony without treatment for his flaring disease.

61. Dr. Emran knew that failure to treat Mr. Loving-Johnson's severe Chron's symptoms could lead to death or serious bodily injury.

62. Dr. Emran knew that, left untreated, Mr. Loving-Johnson's severe Chron's symptoms posed an excessive risk of further unnecessary infliction of pain.

63. Despite this knowledge, and particularly in the face of Mr. Loving-Johnson's documented, progressive physical decompensation from April 14, 2015 onward, Dr. Emran disregarded the excessive risk to Mr. Loving-Johnson's health.

64. Dr. Emran's refusal to offer other medications to Mr. Loving-Johnson, refusal to pursue alternative treatment, refusal to call Mr. Loving-Johnson's MCV doctors, refusal to consult with any specialist, refusal to send Mr. Loving-Johnson offsite for any evaluation or treatment and refusal to send Mr. Loving-Johnson to the hospital was punitive in nature and was done willfully in response to Mr. Loving-Johnson's perceived non-compliance.

65. Dr. Emran's refusals to treat Mr. Loving-Johnson and denial of access to necessary off-site care occurred with subjective awareness of and deliberate indifference toward Mr. Loving-Johnson's objectively serious medical needs and agony.

66. As a direct and proximate result of Dr. Emran's refusal to offer Mr. Loving-Johnson timely, adequate and compassionate medical care, Mr. Loving-Johnson's life was placed in jeopardy, requiring him to undergo emergency surgery to resect his bowel. Mr. Loving-Johnson had to live for years with a colostomy bag, before a second surgery reversed the first procedure. Mr. Loving-Johnson suffered incredible pain, humiliation and anguish as a result of Dr. Emran's punitive and deliberate indifference to his serious medical needs.

WHEREFORE, based upon the foregoing, Plaintiff demands judgment Dr. Emran in an amount in excess of TWO MILLION DOLLARS ($2,000,000.00), for compensatory damages, together with costs incurred in the pursuit of just resolution to this matter, prejudgment and post-judgment interest, and attorneys' fees. Plaintiff also demands punitive damages in the amount of ONE MILLION DOLLARS ($1,000,000.00).

WHEREFORE, the Dr. Emran's conduct having been so willful, wanton, and/or reckless as to evince a conscious disregard for the human and constitutional rights of Mr. Loving-Johnson, Plaintiff demands the award of punitive damages against Dr. Emran in a just amount to be established at trial, together with prejudgment and post-judgment interest, and allowable costs incurred herein pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff seeks such further and additional relief as this Court deems just and proper.

Respectfully filed,

**PARIS LOVING-JOHNSON**

_____/s/_____

Seth R. Carroll (VSB No. 74745)
Commonwealth Law Group, LLC
3311 West Broad Street
Richmond, VA 23230
Phone: (804) 999-9999
Facsimile: (866) 238-6415
scarroll@hurtinva.com

Isaac A. McBeth (VSB No. 82400)
Halperin Law Center
5225 Hickory Park Drive (Suite B)
Glen Allen, VA 23059
Phone: (804) 527-0100
Facsimile: (866) 597-0209
isaac@hlc.law